UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 3:18CV30113

---

CHRISTIAN PERREAULT HAMEL,
    *Plaintiff,*

v.

THE WHEATLEIGH CORPORATION, L.
LINFIELD SIMON, SUSAN SIMON, AND
MARC WILHELM,
    *Defendants.*

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendants, The Wheatleigh Corporation, L. Linfield Simon ("Simon"), Susan Simon, and Marc Wilhelm ("Wilhelm" and collectively "Wheatleigh"), submit this Memorandum of Law in Support of their Motion for Summary Judgment. (the "Memorandum" and the "Motion" respectively) Plaintiff, Christian Hamel ("Hamel"), alleges he was misclassified as exempt form overtime requirements of the Fair Labor Standards Act ("FLSA"), that the misclassification was willful, and that plaintiff is entitled to time-and-a-half for overtime and treble damages.  The FLSA provides that employees employed in a "bona fide executive capacity" are exempt from the statute's overtime requirements. 29 U.S.C. s. 213(a). The essence of the Complaint is that Hamel agreed to accept employment for a managerial position which clearly would make him exempt from overtime but, because he performed "non-exempt work" and was not capable of handling certain managerial duties, he is eligible for overtime.

Hamel's Complaint is one of four complaints filed at the same time by Wheatleigh employees based on alleged violations of the FLSA and Massachusetts Wage and Hours laws, and

he is one of three managers claiming to be non-exempt. It is undisputed that Hamel applied for and accepted a management position at Wheatleigh and moved from Canada to Massachusetts with a clear understanding that he was going to be a have a managerial role at Wheatleigh.

The Department of Labor has issued regulations providing guidance in the interpretation of the "executive" exemption. The Supreme Court in *Encino Motorcars, LLC v. Navarro et al.*, 138 S. Ct. 1134 (2018) has made clear that FLSA exemptions are not to be construed narrowly— rather, FLSA exemptions should be construed fairly. *Id.* at 1142 (recognizing that the FLSA has over two dozen exemptions in Section 213(b) alone, and that "[t]hose exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement.").  To paraphrase, due process and reasonable statutory construction require interpreting the executive exemption so that is not a trap for the unwary but can still be a protection against exploitation.

**STATEMENT OF FACTS**

Wheatleigh hereby incorporates and makes reference to its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment ("SOF"), pursuant to D. Mass. Local Rule 56.1 and the documents cited therein, which are filed herewith.

Wheatleigh has operated a fine-dining restaurant and 19 room luxury hotel in the Berkshires for over thirty years. At all relevant times Wheatleigh's restaurant has received Five Stars from Forbes and Five Diamonds from the Mobil Travel Guide, one of probably less than 100 restaurants in the United States to receive this distinction. At all relevant times Wheatleigh has also operated a luxury hotel with a Five Star rating from Forbes. Wheatleigh's policy and practice has always been to treat its employees fairly, honestly and with respect. During the Great Recession Simon directed Wilhelm (Wheatleigh's general manager) not to lay off any employees or reduce their compensation based on the significant losses Wheatleigh was sustaining. Subsequent to the Great Recession and including the period of Plaintiff's employment at

Wheatleigh, the Simons have received no compensation of any sort from Wheatleigh and have continued to subsidize its operations, including assuring that no Wheatleigh employee was laid off while it was closed during the current pandemic.

Wilhelm grew up in the hospitality business, has a degree from a well-known Swiss hotel school and has overseen the development of Wheatleigh's fine dining restaurant for over 15 years. Wilhelm has seen that as a small property Wheatleigh cannot operate with the same managerial hierarchy as a larger hotel or restaurant. As a part of his hiring process, Wilhelm tells all prospective managers is that they will do what is necessary to make their department and the entire hotel function at the very highest level, including participation in the work of their department and the entire property. Sleeping over at the property and functioning as the manager on duty when the rest of the operation is closed is part of the expected duties of managers. Wilhelm, himself, regularly carries guests' bags, parks and retrieves guests' cars, makes and serves drinks and carries trays to and from the restaurant.

In the winter of 2016-17 Wheatleigh's then-restaurant manager advised Wilhelm of his plan to leave Wheatleigh to assume a position as the food and beverage director at a larger property in Florida, and Wilhelm commenced a search for a replacement.  Hamel's training and high end food and beverage experience was impressive enough to warrant a trip to Wheatleigh for an interview even though he did not have specific experience as a restaurant manager. Subsequent to the trip to Wheatleigh, Hamel's application to be the restaurant manager at Wheatleigh was accepted and he entered into a contract to be restaurant manager. Hamel started work in accordance with his contract on approximately February 10, 2017 with a biweekly pay rate of $1,930. Hamel's biweekly pay rate was increased to $2,140 around May 19, 2017. All of the other restaurant employees whose work Hamel supervised (approximately 6 to 10) received hourly compensation of $8.00 per hour or less plus tips and had no guarantee of hours or tips.

As citizen of Canada seeking temporary entry as a business person to engage in business activities at a professional level, Hamel was required to make application for admission with the Department of Homeland Security   See 8 C.F.R. § 214.6(d)(2).   Hamel was required to present prior to admission "documentation sufficient to satisfy . . . the Department [of Homeland Security] officer . . . that the applicant meets the criteria to perform at such a professional level."  8 C.F.R. § 214.6(d)(3)(ii).  Among other things, "[t]he documentation shall fully affirm . . . a description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity[.]"  8 C.F.R. § 214.6(d)(3)(ii)(B).

On behalf of Hamel, Wheatleigh prepared a border processing application showing that he was to engage in business activities at a professional level.  See SOF at ¶ 5.  This description was substantially similar to the contractual commitment Hamel made to Wheatleigh and described his clearly managerial duties as follows: The job duties included:

> Oversee all facets of the operations of the Food and Beverage department in the hotel; ensure high levels of guest service consistent with Leading Quality Assurance and Forbes Five Star ratings; Oversee maintenance and operations of Library, Dining Room, Portico, Great Hall, Pool, Top and Bottom Terrace, Room Service, Pantry and Wine Cellars; select, train, evaluate, lead, motivate, coach, and discipline all employees in the hotel's food and beverage operations; ensure that established cultural and core standards are met; evaluate staff through daily standard testing as well as annual employee reviews; coordinate staffing development; promote good public relations and handle complaints, concerns, or special requests; conduct regular competitive analysis; manage and forecast labor and operating expenses through effective scheduling, budgeting, purchasing decisions, and inventory and cash control; develop marketing plans and any special restaurant functions; and establish a departmental training program in coordination with the Human Resources Manager." Hamel submitted the TN Visa Application when he presented to the border, and, as a result, he was granted a TN visa and admitted into the United States.  Oversee all facets of the operations of the Food and Beverage department in the hotel; ensure high levels of guest service consistent with Leading Quality Assurance and Forbes Five Star ratings; Oversee maintenance and operations of Library, Dining Room, Portico, Great Hall, Pool, Top and Bottom Terrace, Room Service, Pantry and Wine Cellars; select, train, evaluate, lead, motivate, coach, and discipline all employees in the hotel's food and beverage operations; ensure that established cultural and core standards are met; evaluate staff through daily standard testing as well as annual employee reviews; coordinate staffing development; promote good public relations and handle complaints, concerns, or special requests; conduct regular competitive analysis; manage and forecast labor and operating expenses

through effective scheduling, budgeting, purchasing decisions, and inventory and cash control; develop marketing plans and any special restaurant functions; and establish a departmental training program in coordination with the Human Resources Manager.

See SOF at ¶ 6; see also **Exhibit 5**, TN Visa Application.

Wheatleigh's business is heavily concentrated on the summer season. As a result Hamel's staff was primarily made up of long time Wheatleigh restaurant employees and seasonal staff hired before his arrival in February. Despite his arrival late in the hiring process for the summer season, Hamel was the sole interviewer of Arleta Mongue in May and responsible for hiring her. (Mongue is a plaintiff represented by Hamel's counsel in an action against Wheatleigh joined with this action for purposes of discovery.)   Samuel Fisher was also hired as sommelier based on Hamel's recommendation.

Hamel's role as restaurant manager was otherwise consistent with his contractual agreement, the normal role of a restaurant manager in a small hotel with a fine-dining restaurant and Wheatleigh's expectation that managers would participate in the work of their department. He was "overall" responsible for "planning, directing, and/or apportioning the work of employees, and, as he stated in his deposition, "primarily (he) was to make all operation of the restaurant efficiently, including supervising the staff."  Hamel, in fact, considered himself to be the restaurant manager, and other staff considered him to be the manager as well, and his main complaint seems to have been that Wilhelm sometimes relied on his more extensive experience and role as general manager to limit Hamel's authority.

### ARGUMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if it has the "potential to affect the outcome of

the suit under the applicable law." *Santiago-Ramos v. Ventennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; only a genuine issue of material fact is effective in this regard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal quotations and citations omitted).

Once the movant makes the necessary showing, the non-movants "may not rest upon the mere allegations or denials" of their pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103. "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

### A.      <u>Hamel Earned More Than $455 Per Week.</u>

As above, prong 1 of the executive exemption requires Wheatleigh to establish that Hamel was "paid on a salary basis of at least $455 per week." According to Hamel, he was paid $951.53 per week before taxes. See SOF at ¶ 10. Notwithstanding, Wheatleigh's ADP payroll registers demonstrate that from the inception of his employment to April 29, 2017, Hamel earned a consistent biweekly salary of not less than $1,923.07, regardless of the number of hours he worked. See SOF at ¶ 12. Further, From April 30, 2017 to the final pay period of his employment, Hamel earned a consistent biweekly salary of not less than $2,140.00, regardless of the number of hours he worked. See SOF at ¶ 13. That Hamel was occasionally permitted to keep additional earnings, such as restaurant service charges during Wheatleigh special events, has no bearing on his status as an exempt employee. See *Tomaz v. MAX Ultimate Food*, 2020 WL 5517458 at *4 (D. Mass.

2020), citing *O'Brien v. Town of Agawam*, 350 F.3d 279, 293 (1st Cir. 2003). Wheatleigh is therefore entitled to judgment as to prong 1.

### B. <u>Hamel's Primary Duty Was To Manage Wheatleigh's Restaurant.</u>

The Secretary of Labor ("Secretary") defines the term "primary duty" to mean the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The Secretary defines the term "management" to include a non-exhaustive list of illustrative "managerial" duties, including:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the types of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. s. 541.102.

The Secretary has identified four factors to assist the decision-maker in analyzing the primary duty element of this exemption: (1) the relative importance of exempt duties as compared to other duties; (2) the amount of time spent performing exempt work; (3) relative freedom from direct supervision; and (4) the relationship between the employee's salary and wages paid to other employees. See 29 C.F.R. § 541.700(a). Even if Hamel spent less than fifty-percent of his time performing exempt duties, his primary duty is nevertheless management "if the other [three] factors support such a conclusion." *Id.* at § 541.700(b). None of these factors is alone determinative because, at its core, the primary duty analysis is based on the totality of the circumstances, "with the major emphasis on the character of the employee's job as a whole." 29

C.F.R. § 541.700(a). Thus, Wheatleigh need "carry its burden only on the primary-duty element as a whole, not on each individual factor relevant to that inquiry." *Thomas*, 506 F.3d at 505 n.6.

### 1.  Hamel's Actual Job Duties Epitomize Management.

At his deposition, Hamel was explicit that he was to make all operations of Wheatleigh's restaurant run efficiently, including as to the supervision of the restaurant staff.  See SOF at ¶ 15. Hamel testified he was "overall" responsible for "planning, directing, and/or apportioning the work of employees." See SOF at ¶ 14. Indeed, Hamel was responsible for assigning servers to tables. See SOF at ¶ 31. Hamel would "try to use the staff in the most efficient manner, and if there was a more difficult or complicated table, [he] would give it to the most experienced waiter." *Id.*

Standing alone, these admissions support the legal conclusion that plaintiff "customarily and regularly" performed managerial duties.  See 29 C.F.R. s. 541.102 (defining "management" to include "directing the work of employees.").  Appropriately delegating servers to the tables they will serve—and overseeing the service to ensure efficiency—is vital not only to the success of the restaurant but also to the success of the wait staff, individually and collectively, who rely on the tips provided by the same tables for income.  This is clearly "management" as defined in the DOL regulations.  See *Donovan v. Burger King Corp.* ("*Burger King I*"), 672 F.2d 221, 226 (1st Cir. 1982) ("The supervision of other employees is clearly a management duty.").  No reasonable juror could conclude that this specific supervisory responsibility, along with Hamel's other managerial duties, is not the "main, major, most important," and, therefore, the "primary" duty assigned to Hamel.

Indeed, the record establishes other material, undisputed facts demonstrating that Hamel's actual job duties mirror the managerial duties delineated in his employment agreement, compare **Exhibit 3**, Employment Agreement, with **Exhibit 8**, Hamel's Interrogatory Answers at No. 9, as well as a variety of other tasks the DOL defines as "management,"  see 29 C.F.R. s. 541.102. See

also *Wilbur v. Silgan Containers Corp.*, No. 2:06-CV-02181-MCEEFB, 2008 WL 3863700, at *6 (E.D. Cal. Aug. 19, 2008) (admission that plaintiff performed job description duties "verif[ies] that plaintiff engaged in managerial duties throughout his [employment]."). As set forth above, Hamel engaged in both formal training as well as hands-on teaching of the skills, knowledge, and competencies needed for restaurant staff at Wheatleigh. See SOF at ¶ 16. Hamel coordinated the service facet of the operation of the food and beverage department of Wheatleigh. See SOF at ¶ 7. Hamel was overall responsible for oversight of restaurant resources, including keeping record over Wheatleigh's extensive wine and alcohol inventory. See SOF at ¶ 18. Hamel handled guest complaints or grievances. See SOF at ¶ 20. Hamel likewise had discretion to adjust dissatisfied guests' bills. See SOF at ¶ 23. Hamel played a role in hearing employee complaints and/or grievances. See SOF at ¶ 19. Hamel dealt directly with vendors, making purchases on behalf of Wheatleigh. See SOF at ¶ 32. Hamel facilitated meetings with restaurant staff. See SOF at ¶ 30. Hamel attended Head of Department meetings where Wheatleigh departmental business was discussed. See SOF at ¶ 33. Hamel was in charge of tracking and approving the work hours, including overtime hours, of all restaurant employees—including himself—for payroll purposes. See SOF at ¶ 24. In only 11 months of employment, Hamel interviewed at least five Wheatleigh applicants, including Arleta Mongue. See SOF at ¶ 40-43.

The undisputed facts demonstrate the description and actual job duties are all but identical and that, as a matter of well-established law, Hamel actually performed management work. This conclusion comports with the FLSA's regulations and decisions interpreting them.

### 2.      Hamel managed the restaurant while performing nonexempt tasks.

Hamel asserts in his complaint that, while employed as Wheatleigh's restaurant manager, "[he] primarily served food and drinks and provided other services to restaurant patrons." See **Exhibit 2**, Hamel Deposition at 25. However, the undisputed facts demonstrate that Hamel was

always engaged in concurrently managing the restaurant while performing other non-exempt tasks. Regardless, the time spent engaged in specific tasks is not determinative of Hamel's primary duty, as FLSA's regulations and the weight of authority make clear.

In recognition of the realities of the service industries, the FLSA specifically exempts service executives from the requirement that a majority of their hours be spent performing pure management duties.   See 29 U.S.C. s. 213(a)(1) ("[A]n employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities."); 29 C.F.R. s. 541.700(b) (providing that time alone "is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion.").   Nor does concurrent performance of exempt and non-exempt work disqualify an employee from the executive exemption. *Id.* at s. 541.106(a).   The DOL devised an illustrative example—keyed to an *assistant manager*—of how these concepts work in tandem:

> An assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.

*Id.* at § 541.106(b); see also 29 C.F.R. § 541.703(b) (cataloging service-oriented tasks considered to be "directly and closely" related to exempt work, and by extension, inherently exempt.).

To the extent the time-factor applies in the restaurant-service context of this case, the undisputed facts demonstrate that Hamel concurrently performed exempt and nonexempt tasks as envisioned by the DOL.   See 29 C.F.R. s. 541.106(a) (exempt executives are those who "remain

responsible for the success or failure of business operations under their management while performing nonexempt work."). Here, Hamel would wait tables only if there were not enough servers available on the restaurant floor. See SOF at ¶ 34. He would not wait tables if he had enough staff to do the job. *Id.* Notwithstanding, even when Hamel performed tasks such as setup, cleaning, and waiting tables, he *simultaneously* supervised restaurant staff. See SOF at ¶ 35. See *Flynn v. R.F. Supply, Inc.*, No. 13-62686-CIV, 2014 WL 12531295, at *7 (S.D. Fla. Sept. 19, 2014) (finding management as primary duty where, despite having spent more than 50 percent of his time performing exempt work, "Plaintiff continued his management duties even when performing non-management duties, and was always monitoring the activities of the other employees and supervising them).[1]

Given the reality of managing service operations, courts have flatly rejected "strict time division" in cases involving executive classification in the service industry on grounds that such division is "misleading" because "one can still be 'managing' if one is in charge, even while physically doing something else." *Burger King I*, 672 F.2d at 226, accord *Baldwin*, 266 F.3d at 1114; *Thomas v. Speedway Superamerica, LLC*, 506 F.3d at 504 ("the time factor is less momentous" in service industry cases).

However, even assuming Hamel spent the majority of his time performing nonexempt work without simultaneously managing the restaurant—which Wheatleigh denies—his primary duty was nevertheless management "if the other pertinent factors support such a conclusion." 29 C.F.R.

---

[1] Jones v. Virginia Oil Co., Inc., 69 F.Appx. 633, 637, 2003 WL 21699882 at *4 (4th Cir. 2003) (in finding management as primary duty, court noted that, while plaintiff was engaged in nonexempt tasks, "she also engaged in the supervision of employees, handled customer complaints, dealt with vendors, and completed daily paperwork."); Burger King I, 672 F.2d at 227 ("the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work"); Palazzolo-Robinson v. Sharis Mgm't Corp., 68 F. Supp. 2d 1186, 1190-91 (W.D. Wash. 1999) (finding management was primary duty where plaintiff "remained at all times responsible for assisting in the supervision or directly supervising the day-to-day operations of the restaurant [,]" even when pouring coffee).

s. 541.700(b).   There are three "other pertinent factors" that courts consider: (1) the relative importance of Hamel's exempt duties as compared to his other duties; (2) Hamel's relative freedom from direct supervision; and (3) the relationship between Hamel's salary and the wages paid to other employees.   See 29 C.F.R. 541.700(a).

### 3.    Management Was Hamel's Most Important Duty.

Under the relative importance factor, "courts must compare the importance of the plaintiff's managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Thomas, supra*, 506 F.3d 496, 505; see *Donovan v. Burger King Corp.* ("*Burger King II*"), 675 F.2d 516, 521 (1982) (noting that this factor requires a consideration of which responsibilities are more "important or critical to the success of the [business]"); *Baldwin*, 266 F.3d at 1115 (focusing on plaintiffs' "principal value" to employer); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 886-887 (N.D. Texas 2001) (equating importance to "the purpose of [plaintiff's] employment.").   Where, as here, the facts surrounding this factor are "relatively undisputed[,] the weighing of their importance is for the Court."   *Leonard v. Dolgencorp Inc.*, No. 4:10-CV-57-H, 2011 WL 2009937, at *7 (W.D. Ky. May 23, 2011).

It is undisputed that Hamel considered himself to be the manager of the restaurant department, see SOF at ¶ 9, and considered his primary responsibility to be the efficient operation of the restaurant, see SOF at ¶ 15.   Cf. *Jones, supra*, 69 Fed. Appx. 633, 638 (managing most important duty where plaintiff "acknowledged that she was 'the captain of the ship' at the store, and that she was 'in charge of everything.'"); *Palazzolo-Robinson, supra*, 68 F. Supp. 2d 1186, 1191 (equating relative importance with plaintiff being "ultimately responsible for the restaurant's operations.").   Hamel stated further that, while Mr. Wilhelm may not have instructed him to perform nonexempt work, he did so anyway because "the job needed to get done." See SOF at ¶

12

36. See *Murray v. Stuckey's Inc.*, 939 F.2d 614, 617 (8th Cir. 1991) (concluding managerial employee was a bona fide executive excluded from coverage under the FLSA where he admitted that his primary duty was "to get the job done."); *Light v. MAPCO Petroleum, Inc.*, No. 3:04-0460, 2005 WL 1868766, at *8 (M.D. Tenn. Aug. 4, 2005) (same). As above, these material admissions alone anchor in the conclusion that management was Hamel's most important duty.

It is also undisputed that Hamel was the only day-to-day employee responsible for training; planning, directing, and apportioning restaurant staff tasks; coordinating service; wine and beverage inventory; overseeing team members and resources of the restaurant; handling customer complaints; approving employee work hours; and, most importantly, monitoring and implementing policies to maintain Wheatleigh's 5-star restaurant status.  Without Hamel's managerial duties, significant disruption and devolution of the renowned restaurant would ensue. To be certain, the restaurant could conceivably continue to operate if Hamel ceased to perform nonexempt tasks.  However, if these managerial tasks were not performed, restaurant staff may skip out on training, daily tasks might slip through the cracks, and restaurant performance might become substandard.  This is particularly true given Hamel's training and knowledge, and—as Hamel acknowledged—a scarce pool of potential restaurant employees in Berkshire County capable of carrying an elite restaurant.  See *Jones, supra*, 69 Fed. Appx. 633, 638 (where plaintiff was manager of a Dairy Queen, court held restaurant could not have operated successfully unless plaintiff performed managerial function, including ordering inventory and training employees); *Baldwin, supra*, 268 F.3d 1104, 1115 ("in [the company president's] general absence, someone had to manage the park.  That task fell to [the plaintiffs] and no one else."); *Leonard, supra*, 2011 WL 2009937, at *7 ("someone must be responsible for the overall operations").

The weight of the undisputed facts yields but one reasonable conclusion: Wheatleigh principally valued Hamel's managerial duties.  No disputed facts justify finding otherwise.

    **4.**    **Hamel was relatively free from direct supervision in managing Wheatleigh's restaurant on a day-to-day basis.**

The "relative freedom" factor of the primary duty test "considers only the *relative* freedom from supervision; it does not demand complete freedom from supervision, such that [a manager] is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry." *Thomas, supra*, 506 F.3d 496, 507 (emphasis in original; internal quotations omitted); *Thomas v. Jones Restaurants, Inc.*, 64 F. Supp.2d 1205, 1206 n.4 (M.D. 1999) (restaurant manager whose manager called her at work 10 to 15 times per day and stopped by the restaurant three to seven days a week found to be relative free from supervision); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1327-31, 1334-35 (assistant managers relatively free from supervision when store manager in store with them 40 percent of the time).

Hamel was relatively free from supervision, even though there was often a manager (Mr. Wilhelm) with higher authority on the work premises. See *Guthrie v. Lady Jane Collieries*, 722 F.2d 1141, 1146 (3d Cir. 1983) (employees were exempt from the overtime requirements although higher level employees were also present). At all times, Hamel was the primary individual who was overall responsible for planning, directing, and apportioning restaurant staff tasks, see SOF at ¶ 14; coordinating restaurant service; wine and beverage inventory, see SOF at ¶ 7; overseeing team members and resources of the restaurant; handling customer complaints; approving employee work hours, see SOF at ¶ 15, 20, 24; and, most importantly, monitoring and implementing policies to maintain Wheatleigh's 5-star restaurant status, see SOF at ¶ 25. According to Hamel, in his short employment tenure, he required supervision only in certain specific situations where he had not yet learned Wheatleigh's customs: restaurant staff scheduling and restaurant staff promotion and demotion. See **Exhibit 2**, Hamel Deposition at 54-55 (as to scheduling), 109-110 (as to promotion). As to the former, the significant takeaway is that scheduling was in fact one of

Hamel's primary duties at the time he was hired.  However, Hamel could not satisfactorily perform this duty without supervision from Mr. Wilhelm.  This does not negate that scheduling was part of Hamel's duties, it speaks only to Hamel's job performance relative to that task.  As to the latter, Hamel did not have unfettered discretion to make changes to the employment status of restaurant staff.  However, that Hamel did not have ultimate decision-making authority to enact such changes does not, by itself, render him bound to direct supervision. See *Burson v. Viking Force Corp.*, 661 F. Supp. 2d 794, 802 (N.D. Ohio 2009) ("the fact that plaintiff had a manager who retained control over certain management decisions and dictated how other decisions were to be made did not undermine his authority to run his shift on a daily basis."); *Kastor*, 131 F. Supp. 2d at 868 ("Typically, there is a hierarchy or line of supervision in any corporate entity or business wherein managers and supervisors have persons to whom they must report, and that an individual does not have final supervisory or discretionary authority does not take that person out of the realm of being a manager[.]").  Notwithstanding, Hamel was otherwise responsible for the day-to-day operation of the restaurant, including oversight of the idiosyncratic interactions of restaurant staff with Wheatleigh patrons.

It is also undisputed that Wheatleigh's restaurant operates under detailed quality standards, and that most Wheatleigh departments lacked unfettered discretion to make certain operational decisions without involvement of Mr. Wilhelm.  However, even if the exercise of discretion were still an element of the primary duty analysis, which it is not,[2] these facts are legally insufficient to demonstrate a manager's primary duty is something other than management. See *Baldwin*, 266 F.3d at 1115 ("relative freedom" satisfied where plaintiffs had to adhere to company policies and

---

[2] Wheatleigh notes that the pre-2004 FLSA regulations included the frequency of exercise of discretionary powers as a primary duty factor.  However, the post-2004 FLSA regulations make no reference to discretion in the context of the primary duty analysis.

record completed tasks on checklists); *Burger King II*, 675 F.2d at 521-22 ("The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to 'the book.'  Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made.").

Hamel was responsible for Wheatleigh's restaurant department, as restaurant staff reported directly to him.  He was *relatively* free from direct supervision, with his direct supervisor being Wheatleigh's general manager and co-owner, Marc Wilhelm.  Mr. Wilhelm also supervised every other department on Wheatleigh's premises, including the front office, kitchen, housekeeping, and maintenance.  The undisputed facts overwhelming demonstrate that Hamel was relatively free from direct supervision.

### 5. Viewed in totality, Hamel earned more than the staff he supervised.

This factor is a comparison of Hamel's salary compared to the hourly wages paid to employees of Wheatleigh's restaurant department.  See 29 C.F.R. § 541.700(a).  This factor compares both "whether the manager earned more, in absolute terms, than nonmanagerial employees" and "whether the manager was a 'profit center,' namely, whether the manager had the ability to influence the amount of her compensation."  *In re Family Dollar FLSA Litig.*, 637 F.3d at 517.

As to the relative wage comparison, there is "[n]o specific mathematical formula . . . prescribed for determining whether an allegedly exempt employee's salary is higher than a [nonexempt employee]'s wage."  *Cort. v. Kum & Go, L.C.*, 923 F. Supp. 1173, 1183 (W.D. Mo. 2013).  It is undisputed that Hamel earned $1,930 every pay period before April 30, 2017, at which time he earned $2,140 every pay period.  See SOF at ¶¶ 12, 13 respectively.  The ADP Payroll Registers at **Exhibit 9** further establish that Hamel consistently earned more than the hourly staff he supervised—including most of his staff during the peak summer months at Wheatleigh.

Moreover, it is undeniable that Hamel benefited from his consistent salary pay, particularly during Wheatleigh's slow season, during which time he earned significantly more than hourly restaurant staff.  Accordingly, this Court should enter judgment in favor of Wheatleigh as to prong 2.

     **C.**     <u>**Hamel Supervised More Than Two Full-Time Employees.**</u>

On September 24, 2020 the parties conferred pursuant to the Local Rules of the United States District Court for the District Of Massachusetts 7.1.  The parties stipulated that the evidence established that Hamel directed the work of at least two full-time Wheatleigh employees or their equivalent.  See SOF at ¶ 37.  Wheatleigh is therefore entitled to judgment as to prong 3.

     **D.**     <u>**Hamel Had Authority To Hire And His Recommendations Were Afforded Particular Weight.**</u>

Prong 4 of the executive exemption involves the authority to hire or fire subordinate employees (referred to as the "hire-and-fire" element).  The FLSA's regulations prescribe factors for analyzing the hire-and-fire element of its executive employee test.  See 29 C.F.R. s. 541.105. These factors include "whether it is part of the employee's job duties to make [] suggestions and recommendations; the frequency with which [] suggestions and recommendations are made or requested; and the frequency with which [] suggestions and recommendations are relied upon." *Id.*

Wheatleigh meets its burden on the hire-or-fire element by showing that Hamel's suggestions and recommendations for "hiring, firing, advancement, promotion, *or* any other change of status" were given particular weight—the test is disjunctive."  See 29 C.F.R. s. 541.100(a)(4) (emphasis added).  Suggestions and recommendations are "deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* at s. 541.105.  Evidence that recommendations are given particular weight include, but are not limited to: "whether it is part of the employee's job duties to make such

suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." *Id.*

        **1.**      **Hamel's Job Duties Included Making Recommendations, He Made Recommendations and His Recommendations Were Relied Upon.**

It is undisputed that Hamel lacked unilateral authority to hire, hire, or give raises to employees.  However, Hamel's job duties included making recommendations, he actually made recommendations, and Wheatleigh relied on his recommendations.  The undisputed facts in this case are of the type of Department of Labor deems as evidence that recommendations are given particular weight.

In evaluating the hire-or-fire factor, courts use a practical approach and assess the "totality of the evidence" in determining whether it has been met—akin to the primary duty element's consideration of a job as a whole.  See *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1081 (E.D. Tex. 2011) (applying a "totality of the evidence" standard). Consistent with this approach, courts generally conclude that employees whose job duties include making recommendations regarding hiring, firing, and employment status changes meet the hire-or-fire criteria. See, e.g., *Diaz*, 291 F.Appx. at 950 (plaintiff made recommendations to store manager as to hiring and firing decisions and conducted the first interview of applicants); *Gellhaus*, 769 F. Supp. 2d at 1082-83 (assistant manager's duties included interviewing and hiring employees, conducting "employee coaching," and disciplining employees).[3]

---

[3] See also *Pollard*, 2011 U.S. Dist. LEXIS 24199 at *27 (same, where plaintiff "interviewed all prospective employees and those she liked got a second interview with the district manager."); *Burson*, 661 F. Supp. 2d at 805 (same, where "plaintiff was intimately involved in the interviewing and hiring process" and initiated discipline); cf. *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 531-32 (D. Mass. 2008) (although not listed in his job description, plaintiff's job duties included participation in interview panel, ranking applicants and discussing their merits, recommending applicant suitability to his boss, and discussing potential promotion and reassignment).

As to the frequency of recommendations, the standard is reasonably relative in recognition of the varying realities of the service industry environment.  A manager need not make abundant recommendations to satisfy the hire-or-fire factor, especially where, as here, the restaurant is staffed with relatively few employees—most of whom like and wish to keep their jobs.  See, e.g., *Rooney*, 577 F. Supp. 2d at 531-532 ("[I]t is not necessary for the exempt employee to play a role in every single hire, fire, or promotion"; participation on "multiple occasions" suffices); *Pollard*, 2011 U.S. Dist. LEXIS 24199 at *27 (two hires and terminations); *Roberts v. Nat'l Autotech, Inc.*, 192 F. Supp. 2d 672, 678 (N.D. Tex. 2002) (recruited and hired one individual); *Scott*, 2011 U.S. Dist. LEXIS 32819 at *48 (three promotions based on recommendations).[4]  Indeed, a good manager should make relatively few such decisions or recommendations—because of stable in-restaurant staffing.

Nor must a manager's recommendations always be followed to satisfy the hire-or-fire factor. *Burson*, 661 F. Supp. 2d at 804-05 (hire-or-fire factor satisfied even though plaintiff's recommendations were not followed on numerous occasions); *Pollard*, 2011 U.S. Dist. LEXIS 24199 at *27 (one recommended employee hired); *Gellhaus*, 769 F. Supp. 2d at 1082 ("some recommendations" regarding hiring and status changes were followed).

Here, Hamel's employment agreement expressly delineates the responsibility to "coordinate with the Human Resources Manager regarding pre-screening, hiring, counseling, evaluation, disciplining and termination (if needed) of employees."  See **Exhibit 3**, Employment Agreement.  During the course of Hamel's 11 month employment, he attended two career fairs on Wheatleigh's behalf to recruit and select candidates for interview.  See SOF at ¶ 44.  During the

---

[4] As *Rooney* succinctly notes, workforce size "should be taken into account when determining the frequency of recommendations[,]" because "[i]t is reasonable to assume that generally a smaller [workforce] would have correspondingly fewer new hires, fires, and promotions." 577 F. Supp. 2d at 531.

course of his employment, Hamel interviewed at least five employment candidates, including Arleta Mongue.  See SOF at ¶ 40-43.  According to Hamel, after interviews, he would give feedback to management, and then management would give him permission on which ones to hire. See SOF at ¶ 45.  All five of the interviewees were offered employment in Wheatleigh's restaurant. Hamel also recommended that Wheatleigh hire his acquaintance Samuel Fisher to be Wheatleigh's sommelier. See SOF at ¶ 38.  Hamel took steps to verify Fisher's past employment.  See **Exhibit 17**, Email from Hamel to "bsh.careers@fairmont.com." Fisher was subsequently interviewed by Wilhelm, and an offer of employment was extended to him. See SOF at ¶ 39. As noted, in the Statement of Facts, Hamel was also directly responsible for interviewing and hiring Arleta Mongue on his own.

The evidence, in totality, shows that Hamel's job duties include intimate involvement in hiring, firing, and status changes; that Hamel actually performed these duties; and that Hamel's recommendations were relied upon by Wheatleigh.  Accordingly, this Court should conclude that the hire-or-fire criteria are satisfied as a matter of law, and that Hamel is an exempt executive.

## CONCLUSION

As there can be no question that Plaintiff was hired to perform in an  exempt executive position as Wheatleigh's restaurant manager, Plaintiff is attempting to use certain tasks he performed which may appear to be non-managerial in an after-the-fact attempt to overcome overwhelming evidence of his managerial status.  To permit Plaintiff to parse the tasks he performed as restaurant manager to avoid the executive exemption would not comport with the Supreme Court's fair reading standard and make qualification for the executive exemption a trap for unwary employers rather than a reasonable protection against exploitation of employees. Accordingly, the Court should enter summary judgment for Wheatleigh with respect to Plaintiff's claim that he was improperly classified as an exempt executive.

The Defendants,
**The Wheatleigh Corporation, L.**
**Linfield Simon, Susan Simon and**
**Marc Wilhelm,**

By Their Attorneys,
MORRISON MAHONEY LLP

*/s/ Michael R. Lavoie*

John G. Bagley, BBO #026050
jbagley@morrisonmahoney.com
Michael R. Lavoie, BBO #698745
mlavoie@morrisonmahoney.com
Tower Square
1500 Main Street, Suite 2400
Post Office Box 15387
Springfield, MA 01115-5387
Phone:       413-737-4373
Fax:   413-739-3125

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 5, 2020.

*/s/ Michael R. Lavoie*